**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **EDUCATION MANAGEMENT** | ) |
| **SERVICES, LLC,** | ) |
| | ) |
| *Plaintiff* | ) CIVIL ACTION NO. SA- 15-CA-0044-XR |
| | ) [Removed from the 285th Judicial District |
| v. | ) Court of Bexar County, Texas] |
| | ) |
| **KEITH YACKEY** | ) |
| | ) |
| *Defendant*. | ) |

<u>**PLAINTIFF'S  FIRST AMENDED COMPLAINT**</u>

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW  COMES**  Plaintiff, Education  Management  Services, LLC, files  this  Plaintiff's

First  Amended  Complaint  against  Keith  Yackey,  and  would  respectfully  show  the   Court  as

follows:

<u>**I. PARTIES**</u>

1.      Plaintiff, Education  Management  Services, LLC ("EMS"), is  a  Delaware  limited

liability  company,  authorized  to  do  business  in  the  State  of  Texas,  with  its  principal  place  of

business in San Antonio, Bexar County, Texas.

2.      Defendant, Keith  Yackey, (herein "Yackey") is  an  individual, and  believed  to  be  a

resident  of  Nevada,  who  may  be  served  through  his  retained  counsel  Clint  Alexander  Corrie  of

Ackerman,  LLP,  located  at  2001  Ross  Avenue,  Suite  2550,  Dallas,  Texas  75201.  However,  if

counsel is unwilling to accept service for Yackey, he may be served wherever he may be found. [1]

---

[1] To date, and as will be explained in EMS's response to the Court's Show Cause Order, entered January 27, 2015
{Dkt. No. 3] EMS has made numerous overtures to Yackey's counsel to accept service on his behalf, yet  these
attempts have proved fruitless.

## II. JURISDICTION AND VENUE

3.      On January 21, 2015, Yackey removed this suit from the 285th District Court in Bexar County, Texas, pursuant to 28 U.S.C. § 1441(b), on the basis of the Court's diversity jurisdiction under 28 U.S.C. § 1332(a).

4.      The Court has personal jurisdiction over Yackey, because the factual allegations and causes of action pleaded herein arise from and/or are sufficiently related to the Yackey 's contacts with the State of Texas, such that he may be subject to this Court's specific jurisdiction. Yackey has established minimum contacts with the state of Texas, and this Court's exercise of personal jurisdiction comports with fair play and substantial justice. Yackey purposefully availed himself of the privilege of conducting activities in Texas, involving both the benefits and protections of the state's laws, and therefore subject to jurisdiction in the state.

5.      Venue is proper in the Western District of Texas under  28 U.S.C. § 1441(a), because Yackey removed this suit from the 285th District Court in Bexar County, Texas, which lays within the Western District of Texas, San Antonio Division.

6.      Venue is also proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this district. Additionally, a substantial part of property that is the subject of the action, namely EMS's and affiliates Trade Secrets and Confidential Information, is situated in this Western District of Texas.

## III. FACTS

7.       Plaintiff, Education Management Services, LLC ("EMS"), is a subsidiary of Armando Montelongo Companies, Inc. ("AMC"). AMC is owned by Armando Montelongo, Jr.

("Montelongo"). Montelongo is a successful San Antonio businessman who is well known for staring for three seasons on the A&E network's show, Flip This House.

8.      While Montelongo has actively "flipped homes" and held rental properties ("cash flow properties") across the United States for over twelve years, one of his more successful business ventures is his real estate investment seminar business. Montelongo's seminar business operates under the name Armando Montelongo Seminars, however this is the trade name of AMC's wholly owned company Real Estate Training International, LLC ("RETI"). The Armando Montelongo Seminar's brand is well known throughout the United States for marketing and selling real estate seminar services and products. Customers that attend RETI's seminars (generally referred to as "students")  are taught how to flip real estate and maintain rental "cash flow" properties.

9.      The Armando Montelongo Seminars brand is nationally recognized as a leader in the niche real estate seminar industry. Specifically, in 2011, Inc. Magazine ranked AMC, based almost entirely on RETI's seminar business, as the nineteenth (19th) fastest growing private company in America.[2] Even more, due to the company's national presence and large customer base, RETI is well known within the greater seminar sales and speaking industry for being an excellent place to earn a living.

10.      The main function of EMS is to provide administrative and staffing services to its affiliates, such as RETI. Generally, EMS's affiliates do not hire their own staff, and therefore rely on EMS to meet their administrative and staffing requirements. In order to retain its administrative and staffing services, EMS and its affiliates have entered into various management services agreements. Thus, generally, persons or companies that want to do

---

[2] Inc. magazine publishes an annual list of the 500 fastest-growing private companies in the U.S., the "Inc. 500." Wikipedia, Article on Inc. (magazine) http://en.wikipedia.org/wiki/Inc._%28magazine%29 (last visited Feb 1, 2015).

business or work for with RETI or another seminar related company, must first contract with EMS. EMS then places the individual with the proper company in exchange for a service fee. RETI and other affiliates then license the use of their Trade Secrets and other confidential information to EMS, so that EMS can appropriately train its employees and contractors. EMS also has developed and maintains its own proprietary Trade Secrets.

11.     Pursuant to the management services agreements it has entered, EMS owes its affiliates and indemnification obligation. These indemnification agreements require EMS to act in place of any affiliate harmed by the administrative and/or staffing services provided by EMS. Specifically, this requires EMS to pursue litigation to recover for harm caused by its employees of contractors.

(a) *The Seminar and Mentoring Programs*.

12.     RETI, through its Armando Montelongo Seminars brand, offers multiple different seminar and mentoring packages. The most well-known seminar package the Armando Montelongo Bus Tour (the "Bus Tour"). The Bus Tour is a three day seminar event where Montelongo personally teaches students his house flipping and cash flow system. The Bus Tour program is essential two parts. The first is a seminar style teaching session, the majority of which is conducted by Montelongo. The second part is the actual bus tour. During the bus tour, students are typically separated in five to six groups and travel on coach buses rented by RETI to tour various bank owned/foreclosed properties in the area around the Bus Tour. While touring the example properties, students are shown firsthand, by Montelongo and his staff how to implement his system. This entails how he evaluates, renovates, and markets a "flip or cash-flow" property. Each bus is paired with a "Bus Leader." The Bus leaders job is to supplement what is being taught by Montelongo during each teaching session. While on the bus and walking each

property, the Bus Leaders take questions and provide answers to students. Bus Leaders are volunteers that have shown great success using Montelongo's system and desire to become more involved with RETI. Prior to each Bus Tour, Montelongo along with other EMS and RETI staff train the Bus Leaders on the finer points of public speaking, student management, and Montelongo's flipping system.

13.     During the Bus Tour, student attendees are invited to purchase additional products and services from various affiliates and vendors of RETI. Specifically, the "Master Mentor" coaching and mentoring package ("Master Mentor") is one of the more popular services purchased by students. The Master Mentor package is offered though Performance Advantage Group, Inc. ("PAG"). EMS, provides management and staffing services to PAG pursuant to a management services agreement.

14.     Students that purchase the Master Mentor package receive personalized mentoring and training which builds on material taught at the Bus Tour. Each Master Mentor student is paired with a personalized "Mentor." The Mentors are PAG employees or contractors, who are highly knowledgeable in the real estate industry and Montelongo's flipping and cash-flow system. As part of the package, Mentors travel to meet individual students to do in-home consultations. The in-home visit usually includes the Mentor reviewing and offering advice on how the student can improve their business plan. This includes the Mentor looking at prospective flips in the area and walking through the properties with the student. Additionally, Mentors provide over the phone coaching and training services  paired students. Mentors are required to attend multiple training sessions with Montelongo and EMS and PAG staff, in order to learn how to teach Montelongo's system. Mentors are taught and received updates on the various processes and techniques that are taught by Montelongo. The majority of these training sessions

are held at EMS's headquarters Bexar County, Texas. All information that is taught during the training sessions is considered to be confidential. Furthermore, all Mentors sign non-disclosure/confidentiality agreements prior to receiving the training information.

15. The most elite package offered by either RETI and/or PAG is the "Elite Master Mentor" program. PAG began to offer the Elite Master Mentor program in mid-2012. The program was developed by Montelongo, Yackey, and several other PAG staff members. The Elite Master Mentor program takes place over three days and is the most advanced training program offered by either RETI or PAG. The program is designed to offer students a small and intimate class setting, yet still provides the group learning approach found in Montelongo's larger seminars. During the Elite Master Mentor program, students learn, from Montelongo himself, advanced aspects of his house flipping and cash-flow business strategy including: an in-depth analysis on how to successfully approach and pitch business deals to private money lenders and/or other real estate entrepreneurs; his negotiation philosophy and strategy based on pinpointing and targeting specific personality traits; his Pin Drop" method of targeting an area that is ripe for flipping or cash-flowing; and his approach to the art of making a sale/using public speaking to complete a real estate deal. Additionally, Montelongo spends multiple hours with each individual student/attendee analyzing and giving input to how the student can improve their real estate business strategy. Essentially, the Elite Master Mentor Program provides the most in-depth look behind the scenes of Montelongo's real estate and seminar businesses.

(b) *Yackey's Relationship with EMS, RETI, and Montelongo*.

16. Between 2009 and late September 2013, Yackey maintained a close business and personal relationship with Montelongo.

6

17.     In addition to being one of Montelongo's first success stories, Yackey and Montelongo also became close friends. Their relationship began on or about 2006, when Yackey attended one of Montelongo's first real estate seminars. The relationship lasted for over six years, until Yackey, citing an "increasingly busy schedule and amount of business," abruptly ended the relationship with Montelongo and his companies. *See* [Exhibit A]. Upon information and belief, prior to learning Montelongo's system, Yackey knew very little, if anything about house flipping or cash-flows. He certainly had zero experience using Montelongo's system to flip real estate.

18.     On or about 2010, because Yackey showed great success using Montelongo's system he was offered the opportunity to become a Bus Leader. Eventually, his relationship with Montelongo and the Bus Tour led to Yackey entering a contractual relationship with EMS as a Mentor for the Master Mentor program. In addition to providing services as a Mentor, Yackey continued to be a "Bus Leader" until he ended his relationship with the EMS and RETI in September 2013.

19.     On or about, August 20, 2010, Yackey and EMS entered into a contractor agreement whereby Yackey provided services, via EMS, to PAG's Master Mentor  program  as a "Master Mentor." (the "2010 Agreement") *See* [Exhibit B]. As a Master Mentor, Yackey was paired with individual students and proved the services described in above Paragraphs 13-14. The entire time that Yackey was a Mentor, he utilized the skills, processes, and techniques that he was taught by Montelongo. Moreover, as a Mentor, Yackey was required to attend periodic trainings and strategy meetings, where he received curriculum updates from  Montelongo and other EMS and PAG management. Many of which were held at EMS's headquarters Bexar County, Texas.

20.     Pursuant to the 2010 Agreement, Yackey entered into a Confidentiality/Non-Disclosure Agreement, and a Non-Solicitation and Non-Circumvention Agreement. Under the agreements Yackey promised to refrain from disclosing EMS and affiliates' Trade secrets and confidential information[3] for the receipt thereof.  *See* [Exhibit B; pg.2-5].

21.     On or about Summer 2012, Montelongo and other EMS and PAG staff members began to develop the Elite Master Mentor program. Yackey was intimately involved in the development and production of the Elite Master Mentor program, because of his extensive knowledge of Montelongo's system. Moreover, after five and a half years, Montelongo trusted Yackey, as a friend and business associate.

22.     As previously discussed in Paragraph 15, the Elite Master Mentor program was developed to provide Master Mentor students additional advanced training in a small and personal setting. Specifically, Montelongo wanted to offer the program in a way that students would receive one-on-one training from him, but not lose the feel of group learning experience of the Bus Tour. Therefore, while Montelongo individually met with students, he needed someone, familiar with the atmosphere of the Bus Tour and knowledgeable in his system to keep the class moving forward. Therefore, Montelongo trained Yackey to assist him in teaching the Elite Master Mentor program.

23.      Yackey is not a salesman by trade or training. In fact, upon information and belief, prior to attending Montelongo's seminars and changing his life/  becoming a real estate investor, Yackey worked in the commercial construction business. Therefore, since a large portion of the Elite Master Mentor program's curriculum dealt with Montelongo's own sales methodology and techniques, Yackey was unfamiliar with this material. Furthermore, Yackey had very little, if any, sales training through EMS, PAG, or anywhere else. Therefore, prior to

---

[3] Trade Secrets and confidential information are described more fully on  page 9¶ 24.

each Elite Master Mentor program, Montelongo and other EMS and PAG staff members trained Yackey.

24.     Specifically, Montelongo provided Yackey how to teach the Elite Master Mentor curriculum to the students/attendees. During their meetings, in very specific detail, Yackey received, Montelongo's mental impressions regarding his proprietary methodology behind the operations of RETI's seminar business, and PAG's mentoring business.[4] Yackey also received extensive training, from Montelongo, regarding RETI and PAG's proprietary sales processes and strategies. Additionally, Yackey received from Montelongo, training and access to EMS and affiliates' business development strategies, training materials (including all materials pertaining to the Elite Master Mentor program), teaching materials. Moreover, leading up to and during each program, Yackey received access to highly valuable student lists. Most importantly, Yackey was able to meet with the Elite Master Mentor students themselves. The Elite Master Mentor students are extremely valuable, because of their proven success using Montelongo's system and their continuous involvement with RETI and PAG. But for his involvement with the Elite Master Mentor program, Yackey would have never been granted access to any of the above confidential and proprietary information, much less had direct contact with some of Montelongo's most important students/customers. (the descriptions in this paragraph are collectively referred to as the "Trade Secrets").

25.     While planning and preparing for each Elite Master Mentor program, beginning on or about mid-2102 and the last-time being on or about July 2013, Yackey regularly traveled to EMS's headquarters in San Antonio, Texas. Specifically, on or about July 2013, Yackey traveled to San Antonio, Texas, to participate in the Elite Master Mentor program held at the Elian Hotel. Yackey was the main/featured speaker at this Elite Master Mentor event.

---

[4] Montelongo is the president of both companies.

(c) *Yackey's Suspension and the 2013 Agreement.*

26.     Between January 2010 to November 2012, Yackey maintained an excellent relationship with Montelongo, EMS, and affiliates. However, on or about November 1, 2012, EMS was forced to terminate its relationship with Yackey under the 2010 Agreement. Yackey was notified that pursuant to the results of an internal investigation, EMS was effectively terminating its relationship with him. EMS made this decision because it was discovered that Yackey, was misrepresenting himself as an agent of Montelongo to students, in an attempt to enter into real estate transactions with RETI students. Furthermore, it was discovered that Yackey had and was attempting to funnel Master Mentor customers into his own "mentoring program" for personal gain/benefit outside Montelongo's business structure. It is EMS's strict company policy that EMS employees and/or contractors cannot leverage their position with the company for personal gain in personal business transactions with RETI or PAG students. Furthermore, rarely, if ever does EMS, RETI, or PAG engage in business transactions with students outside the scope of their typical services offered. During the time EMS and Yackey ceased their relationship, Yackey was prohibited from attending RETI's seminar events, including the Bus Tour, the Elite Master Mentor program, and fulfilling any new or current mentorships.

27.     On or about January 22, 2013, EMS reengaged Yackey to perform services for EMS and affiliates under a new contractor agreement (the "2013 Agreement"). Upon information and belief, Yackey sought a new contract with EMS because he was hurting financially and his job as a Mentor provided a consistent and substantial income. After multiple discussions with Montelongo and other EMS management decided to reengage Yackey. During their discussions, Yackey made multiple assurances to Montelongo and other company

management that he would not solicit students/customers and would operate in the best interest of the company. Furthermore, due to their longtime relationship, Montelongo trusted Yackey to be a man of his word.

28.     Under the 2013 Agreement, Yackey once again provided Mentor services to seminar students. *See* [Exhibit C; ¶2-3.3]. He also was allowed to participate in the Bus Tour and a Bus Leader, and the Elite Master Mentor program. In conjunction with the 2013 Agreement, Yackey entered into Confidentiality/Non-Disclosure Agreement, and a Non-Solicitation and Non-Circumvention Agreement. Under the Confidentiality/Non-Disclosure Agreement Yackey agreed to not disclose any Trade Secrets and/or confidential information that he received from EMS and affiliates. *See* [Exhibit C;¶2.1-2.3]. By executing the Non-Solicitation and Non-Circumvention Agreement Yackey agreed that in exchange for receiving access to EMS and affiliates' Trade Secrets and confidential information and good will, he would refrain, for a period of twenty-four (24) months, from soliciting or inducing attempting the like of:

> "…any past or current supplier, client or customer of [EMS] and/or Affiliates with whom [Yackey] dealt, had contact or gained Confidential Information, or any employee or contractor of [EMS] and/or Affiliates, as the case may be to:
>
> (3.2.1) cease or otherwise modify its doing business, in whole or in part, with or through [EMS] and/or Affiliates; or
>
> (3.2.2) do business with any other person, firm, partnership, corporation, or other entity which provides products or performs services materially similar to or competitive with those provided by [EMS] and/or Affiliates or accept any request from any such person or entity to do so." *See* [Exhibit C; pg.4¶3.2].

 (d) *Yackey's Fraud and Competition with RETI and PAG.*

29.     Upon information and belief, during the eight to nine week period that Yackey was not under contract with EMS or affiliates, Yackey began to establish various new business ventures. These new business ventures would not be associated with Montelongo or the seminar

and mentoring businesses. But, Yackey's new business ventures would be based on the information that he had access to and received while under contract with EMS. Namely, Yackey planned on taking the Trade Secrets he had access to and learned directly from Montelongo while working on the Elite Master Mentor program. Yackey also planned to utilize the Trade Secrets that he learned while volunteering as a Bus Leader. As Bus Leader, Yackey, along with all other Bus Leaders, would meet with Montelongo and EMS and RETI staff prior to each Bus Tour. These meetings would take place the day prior to the event and each evening during Bus Tour team dinners. During this time Bus Leaders are exposed to the proprietary strategic business and marketing planning for the Bus Tour. In short, Bus Leaders learn how the Bus Tour is scheduled, designed, and operated so that students receive training from Montelongo and other speakers as efficiently as possible.

30.     However, upon information and belief, Yackey also desired to reengage EMS to begin documenting and gathering the Trade Secrets in an effort to develop his new business ventures. Upon information and belief, when he entered into the 2013 Agreement, Yackey planned to gather as many Trade Secrets as possible and start a mentoring company that directly competes with products and services offered by RETI and PAG. Furthermore, upon information and belief, Yackey entered the 2013 Agreement in order to participate in the 2013 Bus Tours, Master Mentor program, and the Elite Master Mentor program to make as many contacts with RETI and PAG students/customers as possible. This belief is further corroborated by the formation of Yackey's current company Private Money Pro, LLC ("PMP"), with the Nevada Secretary of the state, four days before he entered into the 2013 Agreement. *See* [Exhibit D]. While PMP's formation information states that Jessica Marquez ("Marquez")  is the manager, she is believed to be under the control and direction of Yackey. Marquez is the Yackey's current

cohabitation partner and mother of one of his four children.  PMP is undoubtedly controlled by Yackey.

31.     Upon information and belief, Yackey owns and/or manages  PMP as the disclaimers on his own website,  www.KeithYackey.com, state that Private Money Pro, LLC, holds the intellectual property rights to the site, and is the site contact. *See* [Exhibit E].[5] Additionally, upon information and belief, Yackey operates PMP as a vendor/affiliate brand of Vertucci's seminars. This is corroborated by the attached screen shot taken from Yackey's PMP website showing him on stage at a Vertucci event. *See* [Exhibit F].

32.     Upon information and belief, Yackey uses the PMP brand to directly compete against RETI and PAG by offering mentoring and training services based on the techniques and information that he learned while under contract with EMS. Specifically, PMP offers services whereby customers are taught how to obtain loans from private money lenders to fund real estate deals using the Trade Secrets he received access to while working in the Master Mentor and Elite Master Mentor programs. *See* [Exhibit G].  [6] Lastly, upon information and belief, Yackey has and continues to solicit current and former RETI and PAG customers which he had direct contact with through the Bus Tour, Master Mentor program and Elite Master Mentor program. Specifically, Yackey solicited Garrett Shatzel and Mike Shock to work with him either at Vertucci's company and/or PMP. This belief is further corroborated by Yackey's PMP website's "Testimonials" section where both Shatzel and Shock both appear as testimonials. *See* [Exhibit

---

[5] Yackey's website: www.KeithYackey.com, Private Money Pro is listed as contact in the Terms and Conditions and Privacy Policy sections.
[6] Exhibit H is a screenshot taken from Yackey's PMP website's "About" section.

H].[7] Both Shatzel and Shock are form Master Mentor students and were considered extremely valuable customers of PAG and RETI.

33.     Yackey performed services under the 2013 Agreement until he abruptly terminated his relationship on or about September 26, 2013. In an email, to the then Director of the Mentoring Department, Yackey stated that he was terminating his relationship with EMS "due to [Yackey's] increasingly busy schedule and amount of personal business." *See* [Exhibit A]. Yackey then states how he thinks of Montelongo and other EMS personnel as family. *See Id.*

34.     In late 2013, EMS became aware that Yackey was working with Nick Vertucci and his real estate seminar company, the Nick Vertucci Companies, Inc. d/b/a NV Real Estate Academy (collectively "Vertucci"). Vertucci is a former vendor/contractor of RETI, who had a falling out with Montelongo on or about September 2013. Shortly after terminating his relationship with RETI and Montelongo, Vertucci began marketing his own real estate seminar company, which directly competes with RETI and PAG. Vertucci offers products and services that are, if not direct copies of, incredibly similar to those offered by RETI and PAG, such as the Bus Tour and the Master Mentor program.

35.     Upon information and belief, Yackey currently serves in a management position with Vertucci's seminar company. Upon information and belief, not only has Yackey used the Trade Secrets to directly contribute and develop the products and services offered by Vertucci, but he has and continues to use and implement the Trade Secrets in sales strategy employed by Vertucci. Yackey's contributions not only extend into Vertucci's variation of the Bus Tour, but also to the mentoring services offered by Yackey. Moreover, since Yackey provides services to Vertucci in a same or exactly similar capacity as he did for EMS under the 2010 and 2013

---

[7] Shatzel and Shock are respectively the center and bottom right persons in the linked Youtube.com video that appears in Yackey's PMP website's "Testimonials" section.

Agreements, it is impossible for Yackey to not divulge and use the Trade Secrets learned while he worked for EMS.

36.     Upon information and belief, Yackey on behalf of himself and Vertucci, has and continues to solicit current and former employees and contractors of EMS and affiliates. Specifically, Yackey has personally contacted Chris Sanders and Joshua Buck multiple times in an effort to break their contracts with EMS and affiliates and work for Vertucci. Upon information and belief, Yackey has and continues to solicit current students of RETI and PAG, which he had personal contact with through his involvement in the Bus Tour, Master Mentor, and Elite Master Mentor programs.

## IV. APPLICABLE LAW AND VENUE

37.     Pursuant to his Section 5.10 of the 2013 Agreement, EMS and Yackey (the "Parties") agreed that the laws of the State of Texas shall apply to all aspects of the contract including the governance, interpretation, and performance of the terms and conditions contained therein. Furthermore, the Parties agreed that the state and federal courts sitting in "San Antonio, Texas, shall be the exclusive courts in which venue for any suit relating to the… [2013] Agreement shall lay." *See* [Exhibit C ¶5.10]

## V. CAUSES OF ACTION

### Count 1: Breach of Contract of the 2010 Agreement.

38.     EMS incorporates by reference the entirety of the above paragraphs as though set forth in full herein.

39.     All conditions precedent to enforcement of the 2010 Agreements have occurred or been performed.

40.     Effective August 20, 2010, Yackey entered into an agreement (the "2010 Agreement") with EMS wherein, Yackey, for fair and proper consideration, agreed to certain terms and conditions, which are enumerated above and incorporated by reference and attached hereto.

41.     As part of 2010 Agreement, Yackey agreed to never disclose or use,  EMS and affiliates' Trade Secrets, as described above, without authorization. EMS performed its obligations under the 2010 Agreement by disclosing Trade Secrets to Yackey.

42.     Yackey now provides services to or is employed by Nick Vertucci and/or The Nick Vertucci Companies, Inc. d/b/a NV Real Estate Academy ("Vertucci") within the same scope he did with EMS between 2010 and November 1, 2012. Furthermore, Yackey, through Private Money Pro, LLC ("PMP") provides services to customers within the same scope as he did with EMS, between August 20, 2010, and November 1, 2012. Through his performance with Vertucci and PMP, Yackey has and continues to disclose and use the Trade Secrets and proprietary and confidential information owned by EMS and its affiliates in direct violation of the 2010 Agreement. As a result of these purposeful and malicious actions, Yackey is in breach of his agreement with EMS. Yackey's breach has proximately caused damage to and continues to harm EMS  in an amount according to proof at the time of trial.

**Count 2. Breach of Contract the 2013 Agreement**.

43.     EMS incorporates by reference the entirety of the above paragraphs as though set forth in full herein.

44.     All conditions precedent to enforcement of the 2013 Agreement have occurred or been performed.

45.      Effective January 22, 2013, Yackey entered into a contractor agreement (the "2013 Agreement") with EMS wherein, Yackey, for fair and proper consideration, agreed to certain terms and conditions, which are enumerated above and incorporated by reference and attached hereto.

46.      As part of each of the 2013 Agreement, Yackey agreed to never disclose or use, EMS and affiliates Trade Secrets, as described above, without authorization. EMS performed its obligations under the 2013 Agreement by disclosing its Trade Secrets to Yackey.

47.      Yackey now provides services to or is employed by Nick Vertucci and/or The Nick Vertucci Companies, Inc. d/b/a NV Real Estate Academy ("Vertucci") within the same scope he did with EMS under the 2013 Agreement. Furthermore, Yackey, through Private Money Pro, LLC ("PMP") provides services to customers within the same scope as he did with EMS, under the 2013 Agreement. Through his performance with Vertucci and PMP, Yackey has and continues to disclose and use the Trade Secrets and proprietary and confidential information owned by EMS and its affiliates in direct violation of the 2013 Agreement. As a result of these purposeful and malicious actions, Yackey is in direct breach of his agreement with EMS. Yackey's breach has proximately caused damage to and continues to harm EMS  in an amount according to proof at the time of trial.

### Count 3. Breach of Contract: Non-Solicitation Agreement

48.      EMS incorporates by reference the entirety of the above paragraphs as though set forth in full herein.

49.      All conditions precedent to enforcement of the 2013 Agreement have occurred or been performed.

50.     Pursuant to the 2013 Agreement, Yackey entered into a Non-Solicitation Agreement with EMS, as set forth above in Paragraph 28 (the "Non-Solicitation Agreement"). Under the Non-Solicitation Agreement, Yackey, in exchange for receiving access to EMS and affiliates' good will and Trade Secrets, promised not to solicit current or former employees, contractors, vendors, or customers of EMS and affiliates. Yackey received access to the Trade Secrets over the course of his relationship with EMS and therefore was bound by the Non-Solicitation Agreement.

51.     Yackey has and continues to solicit current and former employees, vendors, and customers of EMS's and affiliates. By soliciting these persons, Yackey seeks to induce them to breach their contracts entered into with EMS's and affiliates. Yackey's actions are a material breach of the Non-Solicitation Agreement.

52.     As a result of these actions, Yackey is in breach of the Non-Solicitation Agreement. Yackey's breach of the Non-Solicitation Agreement's material terms have proximately caused damages to and continues to harm EMS. Yackey's breach has proximately caused damage to and continues to harm EMS  in an amount according to proof at the time of trial.

**Count 4: Tortious Interference with Business Relations**.

53.     EMS incorporates by reference the entirety of the above paragraphs as though set forth in full herein.

54.     Yackey has tortiously interfered with EMS and affiliates' contracts with current and former employees, contractors, and students.

55.     EMS and affiliates had valid contracts and/or continuous business relations with various employees, contractors, businesses, and students/customers. Subsequently, Yackey

intentionally disrupted the business arrangements between EMS and affiliates, and these various business and students/customers.

56.     For example, Yackey upon multiple occasions has improperly and unlawfully solicited Chris Sanders and Joshua Buck, who were each an employee, exclusive contractor of EMS and/or RETI. Furthermore, Yackey improperly and unlawfully solicited Garrett Shatzel ("Shatzel"), and Michael Shock ("Shock"). Shock was not a past and continuing customer at the time of the solicitation, but he also had entered into a confidentiality agreement with RETI for the purposes of becoming a Bus Leader. Upon information and belief, Both Shatzel and Shock have since ceased their relationship with RETI and PAG, and now are employed by either or both Vertucci and Yackey's company PMP.

57.     Yackey had knowledge of the above listed persons solely by his affiliation with EMS. Further, Yackey knew the above persons were valuable to EMS and affiliates because of their training and knowledge of various Trade Secrets. Yackey intentionally and willfully targeted and recruited the above persons to order to induce them to terminate their business relationships with EMS and affiliates. In soliciting the above persons, Yackey sought to benefit himself and his employer based on the individuals knowledge of the Trade Secrets. Specifically, by recruiting persons with knowledge of the Trade Secrets, Yackey, personally, and  his employer Vertucci will be able to more effectively compete with RETI and PAG without engaging in their own product or sales-staff development.

58.     Yackey's tortious interference with the above named person's business relationships have and continue to proximately cause harm to EMS. As such EMS is entitled to recover damages in an amount according to proof at the time of trial.

59.     Furthermore, Yackey's tortious interference was willful and malicious. Thus, EMS is entitled to recover exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.002.

### Count 5. Fraud

60.      EMS incorporates by reference the entirety of the above paragraphs as though set forth in full herein.

61.     Yackey fraudulently represented to EMS that he was acting on EMS's behalf when he entered into the 2013 Agreement.

62.     Yackey committed fraud by misrepresentation, non-disclosure, and omission. Specifically, Yackey made knowingly false representations in an effort to get back in the good graces of Montelongo and induce EMS to permit access to the Trade Secrets, including RETI and PAGs individual customers. Furthermore, Yackey made the misrepresentations to induce EMS to reengage contractual relations with him, because he needed a steady stream of income while he set up his competing company. The Master Mentor program provided him with this income.

63.     Yackey purposefully and intentionally made various misrepresentations to Montelongo and other EMS management regarding his intent to act within the best interests of the company as a Mentor, Bus Leader, and speaker for the Elite Master Mentor program. These false statements were made between November 1, 2012, and January 22, 2013, while Yackey was not under contract with EMS or allowed at any RETI or PAG events. However, while attempting to return to the good graces of Montelongo and EMS management, Yackey began to set up PMP, as evidenced by the formation of PMP on January 18, 2013.

64.     Yackey made further purposeful and intentional false statements to Montelongo and EMS management after RETI and Vertucci relationship ended on or about early September

2013. Yackey omitted and concealed the fact that he secretly planned to terminate his relationship with EMS and join Vertucci's competitive seminar company. Yackey also concealed the fact that he was contacting RETI and PAG clients and EMS employees and contractors to join his and Vertucci's company.

65.    While Yackey provided services to EMS, he was given access to EMS and affiliates' Trade Secrets as described in Paragraph 25 and allowed given full access to the various RETI and PAG customer Facebook groups. These groups are kept private and extensively policed by company management. The carte blanche access to the Facebook groups is especially troubling due to the amount valuable and repeat customers that actively participate in the groups.

66.    Yackey's false representations and omissions were material to EMS's decision to reengage and continue to maintain a business relationship with Yackey. Had EMS known Yackey's true intentions, there would never have been a 2013 Agreement. Furthermore, had EMS known about Yackey's plan to join Vertucci, EMS would have unequivocally  terminated its relationship and filed suit against Yackey.

67.    Additionally, Yackey preyed upon his friendship with Montelongo. Yackey, knowingly took advantage of the level of trust build between him and Montelongo. Yackey was Montelongo's first success story and knew that Montelongo's trusting attitude towards him. Therefore, Yackey knew that Montelongo would welcome Yackey back upon his deceitful representations.

68.    Yackey's false representations and omissions have and continue to directly and proximately cause injury to EMS. Thus, EMS seeks actual damages, including but not limited to

lost revenue, unjust enrichment (benefit of the bargain), brand damage, loss of good will, and costs of brand management and repair, in an amount according to proof at the time of trail.

69.     EMS's injuries resulted from Yackey's actual fraud, oppression, and malice, which entitles EMS to exemplary damages.

**Count 6. Statutory Trade Secret Misappropriation**.

70.      EMS incorporates by reference the entirety of the above paragraphs as though set forth in full herein.

71.     Yackey's actions constitute the misappropriation of EMS and affiliates' Trade Secrets within the meaning of Texas Uniform Trade Secrets Act (the "Act"). Tex. Civ. Prac. & Rem. Code § 134A.002.

72.     The EMS and affiliates own trade secrets. The Trade Secrets, as defined and described in Paragraph 25, were wholly developed and owned by EMS and/or affiliates. The Trade Secrets are not widely circulated and EMS uses reasonable efforts to actively keep the Trade Secrets secret. As such, the Trade Secrets are only known to EMS and affiliates' licensees. EMS and affiliates have developed the Trade Secrets through extensive time, labor, skill, and money, such that the Trade Secrets are proprietary, extremely valuable, and are not easily duplicated or readily ascertainable by the public or competitors. The Trade Secrets provide EMS and affiliates' a substantial competitive advantage within the niche real estate seminar industry, and therefore, are extremely valuable to competitors or other third-parties, like Yackey and his employer Vertucci.

73.     Yackey, acquired the Trade Secrets through improper means. Yackey owed EMS and affiliates an independent duty of non-disclosure when he received the Trade Secrets. Yackey knew the Trade Secrets were confidential and protected. Further, Yackey knew that upon receipt,

he was required to maintain a duty to maintain the Trade Secrets' secrecy and/or limit their use. This duty of non-disclosure was evidenced in each of the contractor agreements described above. Yackey breached this independent duty of non-disclosure by disclosing and using the Trade Secrets to the detriment of EMS.

74.     Yackey further employed improper means to acquire the Trade Secrets by wantonly entering the 2013 Agreement under false pretenses. While Yackey may or may not have known that Vertucci was planning on starting a competing real estate seminar company, he certainly knew that he was planning on and did start a competitive seminar company (PMP). Yackey made the decision to enter the 2013 Agreement knowing that he would terminate his relationship with EMS and then compete with RETI and PAG. Yackey entered the 2013 Agreement in order to receive EMS and affiliates' most up to date Trade Secrets. Furthermore, by, at least early September 2013, Yackey knew he would disclose the Trade Secrets to his own customers and Vertucci and use the Trade Secrets to the detriment of EMS and affiliates.

75.     EMS has been harmed as a result of Yackey's misappropriation. As such EMS is entitled to recover damages in an amount according to proof at the time of trial.

76.     Yackey has been unjustly enriched by his misappropriation. EMS is entitled to recover for Yackey's unjust enrichment that is not taken into account by the actual losses incurred. As such EMS is entitled to recover damages in an amount according to proof at the time of trial.

77.     Yackey's misappropriation of the Trade Secrets was willful and malicious. Thus, EMS is entitled to recover exemplary damages under Tex. Civ. Prac. & Rem. Code § 134A.004(b).

78.     EMS is also entitled to permanent injunctive relief against Yackey. Pursuant to Tex. Civ. Prac. & Rem. Code § 134A.003(a), EMS is entitled to protection against actual or threatened misappropriation. As described above Yackey's continued actions/misappropriation provides himself and Vertucci a distinct competitive advantage. In the alternative, even if Yackey has yet to disclose or use the Trade Secrets for the benefit of himself and/or Vertucci, his position with and the services he provides to Vertucci make his disclosure and/or use of the Trade Secrets inevitable and unavoidable. Therefore, any such threatened disclosure or use will put EMS and affiliates at a distinct competitive disadvantage. An injunction against Yackey continued engagement in direct competition with EMS and its affiliates will eliminate Yackey's ill-gotten competitive advantage.

79.     Alternatively, in the event that injunctive relief cannot remedy the harm caused to EMS and affiliates or Yackey has already profited from his misappropriation, then Yackey's prior actions described herein constitute exceptional circumstances within the meaning of the Act. In this instance, injunctive relief cannot remedy the Yackey's willful and malicious misappropriation of the Trade Secrets. Therefore, Yackey should be made to condition his future use of the Trade Secrets by paying EMS a reasonable royalty.

## VI.  EXEMPLARY DAMAGES

80.     EMS incorporates by reference the entirety of all preceding paragraphs as though set forth in full herein.

81.     Yackey acted with malice toward EMS. Consequently, Yackey is liable for exemplary damages as authorized by Texas Civ. Prac. & Rem. Code §41.003 and Tex. Civ. Prac. & Rem. Code § 134A.004(b).

24

## VII. ATTORNEY'S FEES

82.     EMS incorporates by reference the entirety of the above paragraphs as though set forth in full herein.

83.     Pursuant to Texas Civil Practice and Remedies Code § 38.001 and § 134A.005 EMS is entitled to recover reasonable attorney's fees from Yackey.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, Education Management Services, LLC, respectfully prays that the Defendant, Keith Yackey, be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendant for the following:

a.      Actual and Punitive damages;

b.      Costs of suit;

c.      Reasonable Attorney's fees;

d.      Prejudgment and post-judgment interest;

e.      Disgorgement of profits;

f.      Permanent Injunction; or

g.      In the alternative to a Permanent Injunction, his continued use of Plaintiff's Trade Secrets and Confidential Information be conditioned upon the payment of a reasonable royalty; and

i.      All other relief, in law and in equity, to which Plaintiff may be entitled.

Dated: February 9, 2015.

/s/Andrew Moon
ANDREW J. MOON
State Bar No. 24046463
NATHANIEL CORBETT
State Bar No. 24077165
2935 Thousand Oaks Dr. #6-285
San Antonio, Texas 78247
(210) 501-0077
ATTORNEYS FOR PLAINTIFF

**CERRTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Plaintiff's First Amended

Complaint, has been served on Defendant via the Court's Electronic Case Filing (ECF) System,

or via U.S. Mail, first class postage prepaid, facsimile, of hand delivery in accordance with the

Federal Rules of Civil Procedure on February 9, 2015.

Clint Corrie
Akerman LLP
2001 Ross Avenue
Suite 2550
Dallas, Texas 75201
Via Facsimile No. 866-203-5835

By: /s/ Andrew Moon